## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

VIRGINIA CALL, Administratrix for
the Estate of Dwight E. Call, Deceased,
and VIRGINIA CALL, individually,

                        Plaintiff,

v.                                      CIVIL  ACTION  NO.  3:07-0188

AMERICAN INTERNATIONAL GROUP, INC., a/ka
AMERICAN INTERNATIONAL COMPANIES, et al.,

                        Defendants.

### MEMORANDUM OPINION AND ORDER

Pending before the Court are Plaintiff Virginia Call's Motion for Partial Summary Judgment [Doc. No. 112] and Defendants American International Group, Inc., National Union Fire Insurance Company of Pittsburgh, Pennsylvania, and AIG Domestic Claims, Inc.'s Motion for Partial Summary Judgment [Doc. No. 110].  Also pending is Plaintiff's Motion to Strike Exhibit F from Defendants' Motion for Partial Summary Judgment [Doc. No. 120]; Plaintiff's Motion to Strike Affidavit of Angela Herdman [Doc. No. 119]; and Defendants' Motion to Strike Plaintiff's Expert [Doc. No. 122].  In addition, Defendants' have filed a Motion to Bifurcate and Stay the Bad Faith and Unfair Trade Practice Act (UTPA) Action.  [Doc. No. 126].  The Court held a hearing on these motions on June 2, 2008.  For the following reasons, the Court **GRANTS** Defendants' Motion to Strike Plaintiff's Expert and their Motion for Partial Summary Judgment, and the Court **DENIES** Plaintiff's Motion to Strike Exhibit F, her Motion to Strike Ms. Herdman's Affidavit, and her Motion for Partial Summary Judgment.  The Court further **DENIES AS MOOT** Defendants' Motion to Bifurcate and Stay the Bad Faith and UTPA Action.

# I.
## FACTS

In her Complaint, Plaintiff asserts that in April of 2004 Dwight E. Call purchased a Truckers Occupational Accident Insurance policy from AIG and National Union Fire Insurance Company of Pittsburgh, Pennsylvania. *Complaint*, at ¶ 8.  On October 17, 2004, Mr. Call died and his wife, Plaintiff Virginia Call, filed a claim for benefits on or about June 9, 2006. *Id*. at ¶¶ 10 & 13.  Plaintiff asserts that Defendants failed to pay her claim for benefits so she filed suit against them alleging: breach of policy (Count One), Unfair Claims Settlement Practice Act Violations (Count Two), Actual Malice and Hayseeds' Damages (Count Three), and Reasonable Expectations (Count Four).  Defendants contend, however, that Plaintiff has failed to establish that Mr. Call's death is covered under the policy and, thus, they were justified in denying the claim.  Upon review, the Court agrees with Defendants that Mr. Call's death was not covered by the policy.

Mr. Call worked as a truck driver for Dana-Suttles Truck Leasing, Inc.  It is undisputed that at the time of his death, Mr. Call was near his truck while a liquid dye was being transferred from the truck to a storage tank at a facility in Louisiana.  There are no witnesses who saw what actually happened to Mr. Call.  However, Glen Hanchey, an employee of the facility, found Mr. Call dead lying face up on the ground next to his truck.  Mr. Call had a small amount of blood coming from his mouth.  The Emergency Medical Service report noted there was no visible trauma.

In an affidavit provided to Plaintiff's counsel, Mr. Hanchey stated that he was with Mr. Call immediately prior to his death.  Mr. Hanchey said that Mr. Call arrived at the facility to

-2-

unload the dye at approximately 9:30 a.m. *Affidavit of Glen Hanchey*, at ¶ 5.  The temperature outside was around 85 degrees. *Id*. at ¶ 6.  Mr. Hanchey claimed that Mr. Call appeared fine and did not seem to be having any problems. *Id*. at ¶¶ 7-9.  To unload the dye, Mr. Call unraveled an approximately 50 pound, two-inch, 40 foot long hose and drug it around the front of the truck to the tank. *Id*. at ¶¶ 10 & 11.  Mr. Hanchey stood near the tank so he could signal to Mr. Call when the tank was almost full so that the pump on the truck could be turned off. *Id*. at ¶ 12.  When the tank was full, Mr. Hanchey said he signaled to Mr. Call to shut off the pump. *Id*. at ¶ 15.  Mr. Call walked around the side of the truck in the direction of the hose and out of Mr. Hanchey's sight. *Id*. at ¶ 16. When the pump was not shut off, Mr. Hanchey said he shouted for Mr. Call, but he received no response. *Id*. at ¶ 17.  Mr. Hanchey walked around the truck and found Mr. Call on the ground. *Id*. at ¶¶ 18 & 20.  Mr. Call was not breathing and blood was coming from his mouth. *Id*. at ¶¶ 20 & 22-23.  Mr. Hanchey stated "the blood appeared to be induced from some sort of trauma." *Id.* at ¶ 24. Mr. Hanchey called 911, and the paramedics arrived twenty minutes later. *Id*. at ¶ 25.

In response to Mr. Hanchey's Affidavit, Defendants submitted the Affidavit of Angela D. Herdman.[1]  Ms. Herdman, an attorney for Defendants, said that she spoke over the phone with Mr. Hanchey. *Affidavit of Angela D. Herdman*, at ¶¶ 1-3.  Mr. Hanchey told her that there were no objects lying on the ground near Mr. Call which would suggest he was struck by or tripped over anything, nor were there any vehicles which would have struck him. *Id*. at ¶ 4n & o.  Mr. Hanchey said he did not hear Mr. Call shout out in pain, surprise, or shock. *Id*. at ¶ 4p.  In addition, he stated that he saw a small amount of blood coming from his mouth, but "[h]e did not see any visible signs

---

[1]Exhibit G to Defendants' Response to Plaintiff's Motion for Partial Summary Judgment.

of cuts, bruises, abrasions, or red marks on Mr. Call's head or body." *Id*. at ¶4q.  Mr. Hanchey also

said it was a sunny day with the temperature around 70 degrees. *Id*. at ¶4c.


A death certificate was entered in Louisiana and was signed by Alfred R. Gould, MD,

Coroner.  Dr. Gould contacted Plaintiff on the day of her husband's death and asked for medical

information. *Deposition of Virginia Call*, at 66.  Later that day, Dr. Gould called Plaintiff back and

stated that he had spoke with Mr. Call's physician who told him that Mr. Call had a previous heart

attack in 1990. *Id*. at 67.  Dr. Gould informed Plaintiff that he believed Mr. Call died of a heart

attack, but he did not do an autopsy.  Plaintiff said that she asked Dr. Gould to perform an autopsy,

but he told her he would not because he did not believe it was necessary. *Id*.  It is not disputed that

an autopsy was never performed.[2]  Dr. Gould wrote on the death certificate that the cause of Mr.

Call's death was an Acute Myocardial Infarction secondary to Coronary Heart Disease.


In her Response to Defendants' Motion for Partial Summary Judgment, Plaintiff

attached a Supplemental Exhibit, which is an Affidavit of Hamada Mahmound, M.D.  In his

Affidavit, Dr. Mahmound states that he is a coroner and Deputy Chief Medical Examiner of The

Office of the Chief Medical Examiner of West Virginia. *Affidavit of Hamada Mahmound, M.D.*, at

---

[2]Attached as Exhibit 8 to Plaintiffs' Motion for Partial Summary Judgment is a letter dated November 9, 2007, from Dr. Gould's son, Alfred R. Gould, Jr.  It appears that defense counsel sent Dr. Gould a subpoena duces tecum for information pertaining to Mr. Call's death.  Dr. Gould authorized his son to make a return on his behalf, and his son stated in his letter that he searched his father's records and found no information related to Mr. Call.  He also asked his father about the case, but his father was diagnosed with Alzheimer's Disease approximately two years earlier and he said he had no independent recollection of the case.  At the motions hearing, the Court was informed that Dr. Gould has since died.

¶¶ 3 & 5.  Based upon his review of Mr. Call's Death Certificate and the facts surrounding its completion, Dr. Mahmound opined "to a reasonable degree of medical probability, that Dr. Gould . . . did not follow the appropriate standards for investigating the cause of death in making a definitive determination as to the cause of death" and that Dr. Gould's "failure to perform an autopsy and/or obtain Dwight Call's medical records, is outside the professional standards for making a definitive determination as to the cause of death[.]" *Id*. at ¶¶ 14 & 15.  Thus, Dr. Mahmound found [t]hat, at best, the determination of death listed on Dwight Call's death certificate is a very wild guess[.]" *Id*. at ¶ 16.

Also attached as Exhibit F to Defendants' Motion for Partial Summary Judgment are a number of medical records which show that Mr. Call suffered from heart disease for at least thirteen years prior to his death.  Mr. Call had a prior myocardial infarction and, as a result, had bypass surgery in 1991.  He also had a history of coronary artery disease, hypercholesterolemia, and a family history of atherosclerotic coronary vascular disease.  In 2002, he had abnormal results from a stress test and, at the time of his death, he was taking medication for hypertension and diabetes.

## II.
## DISCUSSION

### A.
### Motion to Strike Medical Records

In their motions, the parties argue over what consideration, if any, the Court should give much of the evidence submitted.  For instance, Plaintiff asks this Court to Strike Exhibit F which is the medical records.  Plaintiff argues that the Accidental Death and Dismemberment Claims Unit at AIG Domestic Claims, Inc. (AIGDC) "failed to obtain Dwight Call's medical records prior

to making a determination that his claim was not covered pursuant to the insurance policy at question." *Plaintiff's Motion to Strike Exhibit F from Defendants' Motion for Partial Summary Judgment*, at ¶ 11.  It was not until discovery during this action that AIGDC obtained the medical records attached as Exhibit F. *Id.*  at ¶¶ 12 & 13.  Plaintiff argues it is improper for an insurance company to justify its denial of a claim by relying upon subsequently obtained information.  In addition, Plaintiff asserts that it violates the West Virginia Unfair Clams Settlement Practices Act's (UPTA) goal of protecting insureds from insurance companies denying claims without conducting reasonable investigations.  Plaintiff insists that this case should be treated similar to those arising in the context of the Employee Retirement Income Security Act (ERISA), and the Court's review should be limited to the information the plan administrator, or in this case AIGDC, had at the time it denied benefits.

Defendants counter this argument by arguing that Plaintiff has confused the issue of coverage with her bad faith claim under the UPTA.  The Court agrees with Defendants.  Courts are filled with cases in which insurance companies deny claims, suits are brought, and discovery is conducted to determine if coverage exists under the policy.  Although a failure to properly investigate a claim may give rise to an action under the UPTA, its does not prevent the parties from submitting additional information regarding whether benefits are payable.  In fact, if the Court were to adopt Plaintiff's argument that the only record the Court should consider is the one that was before AIGDC at the time it denied benefits, it appears that Plaintiff would be eliminating one of the theories of her own case.

During the course of this litigation, Plaintiff got the Affidavit of Mr. Hanchey which appears to have been signed in April of this year.[3]  As previously stated, Mr. Hanchey said in his Affidavit that the blood he observed in Mr. Call's mouth seemed to be caused by some sort of trauma.  However, the documents Plaintiff's counsel attached to the letters he sent on June 2 and 12 2006, asserting her claim for benefits, do not provide any evidence of trauma.  Attached was a completed Driver Enrollment Form; the Death Certificate, stating the cause of death was an Acute Myocardial Infarction secondary to Coronary Heart Disease; a completed Claim Form, in which counsel for Plaintiff wrote the cause of death was an Acute Myocardial Infarction as Mr. Call "was sitting at a refinery in Louisiana when he suffered a heart attack and immediately passed away[;]" and a list of physicians he saw.   If these documents were the only ones before AIGDC at the time it denied the claim, there would be no evidence that Mr. Call suffered any trauma, thereby, eliminating Plaintiff's theory.  Nevertheless, for the reasons stated above, the Court finds that it is not limited to considering the evidence that was before AIGDC and, therefore, **DENIES** Plaintiff's Motion to Strike Exhibit F from Defendants' Motion for Partial Summary Judgment. [Doc. No. 120].

**B.**
**Motion to Strike the Affidavit of Angela Herdman**

In addition, Plaintiff moves the Court to strike the Affidavit of Angela Herdman as she asserts it is inadmissible hearsay.  Defendants contend, however, that the Affidavit is admissible because it is not offered for the truth of the matter asserted but, instead, it is offered to impeach the Affidavit of Mr. Hanchey.  Defendants request that this Court allow the parties to depose Mr.

---

[3]On the signature page of the Affidavit, it has an area for a notary's signature.  The Affidavit is not notarized, but states "[s]worn to before me and subscribed in my presence this _____ day of April, 2008."

-7-

Hanchey to determine what exactly his testimony is.  Upon review, the Court agrees with Defendants.  The purpose of Ms. Herdman's Affidavit is not to prove the truth of what Mr. Hanchey purportedly told her over the phone.  Rather, the purpose is to show that there is a discrepancy between what Mr. Hanchey said in his Affidavit and what he allegedly said over the phone. Therefore, the Court **DENIES** Plaintiff's Motion to Strike Affidavit of Angela Herdman [Doc. No. 119].  However, as will be explained later, the Court finds that, even if the Court disregards Ms. Herdman's Affidavit and accepts the Affidavit of Mr. Hanchey as is, his Affidavit is not sufficient to create a triable issue on whether or not Mr. Call suffered any trauma prior to his death.

### C.
### Motion to Strike the Affidavit of Dr. Mahmoud

Next, Defendants move the Court to Strike the Affidavit and any testimony of Dr. Mahmoud.  Defendants assert that Dr. Mahmoud was not timely identified as an expert, nor was he disclosed in accordance with Rule 26(a)(2)(A) of the Federal Rules of Civil Procedure.[4]  By stipulation of the parties, the deadlines for disclosing experts and rebuttal experts were in November and December of 2007.  Plaintiff filed her expert disclosures on November 5, 2007, and then filed a supplemental disclosure on December 10, 2007.  Defendants filed their disclosures on December 10, 2007, and named their rebuttal expert witness on December 21, 2007.  Neither of Plaintiff's disclosures identify Dr. Mahmoud as an expert.

---

[4]Rule 26(a)(2)(A) states: "**(2)** *Disclosure of Expert Testimony*.  **(A)** *In General*.  In addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Fed. R. Civ. P. 26(a)(2)(A).

Defendants assert that the first notice they received of Dr. Mahmoud was when his Affidavit was attached to Plaintiff's Response in Opposition to Defendants' Motion for Partial Summary Judgment which was filed on April 29, 2008, which is clearly beyond the disclosure deadlines. Moreover, Defendants assert the disclosure itself does not comply with Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure[5] because the Affidavit does not provide a list of any exhibits,

---

[5]Rule 26(a)(2)(B) provides:

> **(2)** ***Disclosure of Expert Testimony***.
>
> \*          \*          \*
>
> **(B)** *Written Report*. Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report--prepared and signed by the witness--if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:
>
> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
>
> (ii) the data or other information considered by the witness in forming them;
>
> (iii) any exhibits that will be used to summarize or support them;
>
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
>
> (v) a list of all other cases in which, during the previous four years, the witness testified as an expert at trial or by deposition; and

(continued...)

the witness' qualifications, a list of other cases, or a statement of compensation.  Given this late and incomplete disclosure, Defendants argue that they are unfairly prejudiced in trying to prepare for trial.  If, however, the Court decides to deny Defendants' motion, they request a continuation of the trial and for the Court to allow them 30 days to depose Dr. Mahmoud and to disclose a rebuttal expert.

Plaintiff responds by stating that she did not know that Defendants would rely upon the death certificate to establish the cause of death until they filed their Motion for Partial Summary Judgment.  Therefore, Plaintiff states she had a substantial justification for failing to disclose Dr. Mahmoud before the deadline.  In addition, Plaintiff asserts that Defendants are not prejudiced by the late disclosure as she is willing to allow additional discovery and/or allow Defendants to take Dr. Mahmoud's deposition.

Rule 37 of the Federal Rules of Civil Procedure prohibits a party from using a witness who was not disclosed in accordance with Rule 26(a) "unless the failure was substantially justified or is harmless[.]"[6]  Here, the Court finds no substantial justification why Plaintiff did not timely

---

[5](...continued)
> (vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B).

[6]Rule 37(c)(1) provides, in part:

> **(1) *Failure to Disclose or Supplement*.**  If a party fails to provide information or identify a witness as

(continued...)

-10-

disclose Dr. Mahmoud pursuant to Rule 26.  Plaintiff submitted the death certificate as part of her claim for benefits, and counsel wrote on the claim form that Mr. Call died of an Acute Myocardial Infarction.  Therefore, it should have come as no surprise to Plaintiff that Defendants would rely upon the death certificate and the fact it states that Mr. Call died of a heart attack in support of their Motion for Partial Summary Judgment.  Thus, the Court **GRANTS** Defendants' Motion to Strike Plaintiff's Expert as he was untimely disclosed. [Doc. No. 122].  For the reasons stated below, however, even if the Court were to consider Dr. Mahmoud's Affidavit and discount the death certificate as being evidence of the cause of death, Plaintiff's coverage claim still fails.

## D.
### Cross-Motions for Partial Summary Judgment

Having resolved what evidence the Court may consider with respect to the parties' cross-motions for partial summary judgment, the Court now turns to resolve those motions.  To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most

---

[6](...continued)

> required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Fed. R. Civ. P. 37(c)(1), in part.

favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

In their motion, Defendants argue that Mr. Call died of natural causes for which there is no coverage under the policy. On the other hand, Plaintiff insists that Mr. Call could have died from either trauma or a heart attack and both are covered claims. With respect to the trauma claim, the Court finds that the only evidence Plaintiff has submitted to support a claim that Mr. Call's death was caused by trauma is the conclusory statement by Mr. Hanchey that he believed the blood coming from Mr. Call's mouth was caused by some sort of trauma. There is nothing in the statement that indicates what the trauma could have been caused by or how the trauma occurred. Indeed, Mr. Hanchey's statement appears to be mere speculation on his part as there is no basis for the statement other than the fact that there was blood. As indicated by Defendants, it could be that Mr. Call

simply bit his tongue. Without more, the Court finds that Plaintiff has failed to show by more than a mere scintilla of evidence that trauma caused Mr. Call's death.

In the alternative, Plaintiff argues that, even if it is assumed that Mr. Call died from a heart attack, it is still covered by the policy. The Truckers Occupational Accident Insurance policy provides, in part:

> **Accidental Death Benefit**
>
> If Injury to the Insured Person results in death within the Incurral Period shown in the Schedule, the Company will pay the Principal Sum, subject to any applicable Deductible Amount for the Accidental Death Covered Loss shown in the Schedule. The Incurral Period starts on the date of the accident that caused such Injury.

*Truckers Occupational Accident Insurance policy*, at 8. "Injury" is defined under the policy as:

> bodily Injury to an Insured Person caused by an Occupational accident while coverage is in force under this Policy, which results directly and independently of all other causes in a Covered Loss. All Injuries sustained by an insured Person in any one accident shall be considered a single Injury.

*Id*. at 3. The policy defines "Occupational" as:

> with respect to an activity, accident, incident, circumstances or condition involving an Insured, that the activity, accident, incident, circumstance or condition occurs or arises out of or in the course of the Insured performing services within the course and scope of contractual obligations for the Policyholder, while under Dispatch. Occupational does not encompass any period of time during the course of everyday travel to and from work.

*Id*. at 4. In addition, the policy contains the following exclusion:

This Policy does not cover any losses caused in whole or in part by, or resulting in whole or in part from, the following:

\*       \*       \*

2.      sickness, disease or infections of any kind, except bacterial infections due to an accidental cut or wound, botulism or ptomaine poisoning[.]

*Id*. at 14.  Defendants argue that Mr. Call's heart attack is not covered by the policy because it was not caused by an occupational accident and did not result directly and independently of all other causes.  In fact, Defendants assert it is specifically excluded under the policy because it was caused by sickness and/or disease, that is coronary heart disease.  Upon review, the Court agrees that Plaintiff has failed to show Mr. Call's death was the result of an "accident."

To begin, it is important to recognize that it is Plaintiff's burden to show that Mr. Call's death is covered by the policy.  Here, there is no dispute that Mr. Call was working when he died.  However, the Court finds that Plaintiff has failed to meet her burden that Mr. Call's death was caused by an "occupational accident . . . which results directly and independently of all other causes[.]"  The term "accident" is not defined in the policy, and both parties insist that the term must be given its ordinary and plain meaning.  The parties disagree, however, on what that meaning should be.

Plaintiff states that the West Virginia Supreme Court resolved the issue in *West Virginia Fire & Cas. Co. v. Stanley*, 602 S.E.2d 483 (W. Va. 2004), in which it quoted one of its earlier per curiam opinions which quoted from another court's definition of "accident" as "'an

unusual, unexpected and unforeseen event . . . . An accident is never present when a deliberate act is performed unless some additional unexpected, independent and unforeseen happening occurs which produces the damage . . . . To be an accident, both the means and the result must be unforeseen, involuntary, unexpected, and unusual.'" 602 S.E.2d at 492 (quoting *State Bancorp, Inc. v. U.S. Fidelity and Guar. Ins. Co*., 483 S.E.2d 228, 234 (W. Va. 1997), which quotes *Harrison Plumbing & Heating, Inc. v. New Hampshire Ins. Group*, 37 Wash.App. 621, 681 P.2d 875, 878 (1984) (other citations omitted)). The West Virginia Supreme Court then went on to say that "[t]he common and everyday meaning of 'accident' is a chance event or event arising from unknown causes." *Id*. Plaintiff argues that because Mr. Call's alleged heart attack was "an unusual, unexpected and unforeseen event," it should be deemed an accident under the policy. However, this Court disagrees.

The Court notes that the facts of *Stanley* are entirely dissimilar to the facts of this case. *Stanley* involved, in part, whether sexual abuse could be considered an "accident" under a liability policy. *Id*. at 491. In applying the above definition, the *Stanley* court concluded that the deliberate acts described in the complaint did not fit within that definition and, thus, coverage did not exist under the policy. *Id*. at 492. This present case, however, is very different, and the Court finds that a single definition of the word "accident" is difficult to apply to all factual situations without perverting the common understanding of what the word entails.

Although the West Virginia Supreme Court has not addressed the issue of whether a heart attack should be considered an "accident" under the terms of an insurance policy, other

courts have recognized that the term is difficult to define and it must be viewed in light of the facts of each case.  As the Supreme Court of Oregon said in *Botts v. Hartford Accident & Indemnity Co.*, 585 P.2d 657 (Or. 1978), "[t]here are probably not many words which have caused courts as much trouble as 'accident' and 'accidental'" because they do not "lend themselves to specific or exact meanings, yet, everyone thinks he knows an accident when he sees one." 585 P.2d at 660 (citations omitted); *see also Senkier v. Hartford Life & Acc. Ins. Co.*, 948 F.2d 1050, 1053 (7th Cir. 1991) (Judge Posner stating "[a] lay person has a clear if inarticulate understanding of the difference between an accidental death and a death from illness, and that understanding will not be altered or improved by head-spinning judicial efforts at definition").  The *Botts* court explained that the problem arises when one tries to create an "all-encompassing definition" of the words "without regard to the particular factual circumstances in which the meaning of the terms is bought into question." *Id*.  In addressing the issue of on-the-job heart attacks, the court gave the example that a heart attack is not ordinarily considered an accident if it "results from events or activities which are the normal, expected ingredients of the victim's everyday life, . . . even though . . . it is brought about by voluntary conduct which results in unforeseen and unexpected injury or death." *Id*. at 661. However, coverage may exist if "the job-related activity leading to a victim's heart attack was abnormal and unusual, taking into consideration the ordinary requirements of his job performance." *Id.*

In *Botts*, the decedent died of a myocardial infarction while he was operating a road grader. *Id*. at 658.  The decedent was learning how to operate the grader when he was taken to a hospital and died shortly thereafter of a heart attack. *Id*.  The decedent's doctor testified the heart

-16-

attack was brought on by exertion and mental strain. *Id*.  Plaintiff argued that, on the day of his

death, decedent's job was more difficult because there was not a flagman on duty and there were an

unusual number of dump trucks waiting to be unloaded. *Id*.  However, in reviewing the facts, the

court found there was nothing so abnormal or unusual about the decedent's job to create a jury

question regarding whether his death was accidental "as that term is understood by the ordinary

purchaser of a policy." *Id*. at 661.   Although most of the time there was flagman on duty, the

occasional absence of a flagman was expected, and the fact that the trucks backed up to unload was

not that unusual with an inexperienced grader. *Id*.  Therefore, the court affirmed the lower court's

verdict for the insurer. *Id*. at 662.


          Similarly, the United States District Court for the Northern District of Illinois in

*Haley v. American International Life Assurance Company of New York*, 789 F. Supp. 260 (N.D. Ill.

1992), found that the decedent's heart attack was not an accident under an accidental death and

dismemberment policy.   In *Haley*, the decedent left for work, but returned approximately thirty

minutes later stating that he did not feel well. 789 F. Supp. at 261.  A few minutes later, the decedent

was found unconscious on his bed and was rushed to the hospital where he died. *Id*.  The attending

physician at the hospital determined the decedent died of heart attack that was not "caused by any

'trauma' or 'foul play.'" *Id*.  Although the decedent never experienced any problems with his heart

or had signs of heart disease, the death certificate indicated "the immediate cause of death was

'artherosclerotic cardiovascular disease,' which is the build-up of cholesterol plaques in the

cardiovascular system." *Id*.  It appears that an autopsy was not performed to determine the presence

of the disease, but "the medical examiner/coroner testified that he listed this disease as the cause of

-17-

death . . . because it is a common reason for death in similar circumstances.  The medical examiner/coroner also concluded that . . . [the decedent] died of natural causes[.]" *Id*.  The insurer denied the decedent's wife's claim for benefits stating that "the death was not the result of an injury caused by an accident" and it was the result of natural causes. *Id*. at 262 (internal quotations omitted).

In looking at the policy language, the court found the term "injury" was defined as a "'bodily injury caused by an accident and resulting directly and independently of all other causes in loss covered by the policy . . . .'" *Id*. at 262.  However, the court noted that the term "accident" was not defined by the policy and, therefore, the plaintiff had the burden to prove that her husband's "death was accidental, as the term is commonly understood." *Id*. (citing Judge Posner's decision in *Senkier*).  The court explained that the term "'accident' normally designates an unforseen occurrence, usually of untoward or disastrous character, or an undesigned sudden or unexpected event of an inflictive or unfortunate character . . . .  The natural and ordinary consequences of an act do not constitute an 'accident.'" *Id*. at 263 (internal quotation marks and citations omitted).  Thus, the court found that "[a]s a general rule, in the absence of any unexpected or unforeseen trauma, external force or event which causes or triggers a heart attack, it is presumed that the death is a death by natural causes, not by an accident." *Id*. (citing *Riesterer v. Crown Life Ins. Co.*, 653 F.2d 268, 269 (6th Cir. 1981) (finding no evidence of an accidental bodily injury when a firefighter suffered a heart attack inside a burning building as it was not an abnormal or unusual work environment for a firefighter); *Benante v. Allstate Ins. Co.*, 477 F.2d 553, 555 (5th Cir. 1973) (holding that "a heart attack resulting from strain is not an accident or accidental bodily injury").

-18-

This Court agrees with these cases. As the word "accident" is not defined in the current policy, the Court must give effect to its ordinary and plain meaning. The Court finds that merely because the West Virginia Supreme Court in *Stanley* quoted language defining an "accident" as an "unforeseen, involuntary, unexpected, and unusual event," that definition does not adequately cover a situation in which someone may have died of natural causes. Instead, the ordinary and plain meaning of the word "accident" must be viewed in light of the factual circumstances in which it arises. In the context of heart attacks, the plaintiff must show that "the job-related activity leading to a victim's heart attack was abnormal and unusual, taking into consideration the ordinary requirements of his job performance." *Botts*, 585 P.2d at 661. Moreover, the Court agrees with *Haley* that "[a]s a general rule, in the absence of any unexpected or unforeseen trauma, external force or event which causes or triggers a heart attack, it is presumed that the death is a death by natural causes, not by an accident." 789 F. Supp. at 263.

In this case, Plaintiff has failed to meet her burden of proof that Mr. Call died of an "accident." Plaintiff makes no allegation that Mr. Call was doing anything abnormal or unusual with respect to his job when he died. Prior to his death, he unraveled a hose and attached it to a tank so the dye in the truck could be unloaded. After the tank was filled, Mr. Call went to turn off the electric pump and he died. At best, the temperature outside was 85 degrees. None of these factors are such that they demonstrate abnormal or unusual work conditions. In addition, the Emergency Medical Service report noted there was no visible trauma. As the Court previously discussed, the only suggestion of trauma comes from Mr. Hanchey's Affidavit in which be believes there may have been some form of trauma because there was a small amount of blood coming from his mouth. As

-19-

indicated by Defendants, however, Mr. Hanchey's statement is unsupported supposition.  Plaintiff presents no evidence that Mr. Call was hit by anything, tripped over something, or suffered from any form of trauma.  In addition, Plaintiff has not provided any medical expert who will testify that blood from the mouth is indicative of trauma.  The fact that Mr. Call had blood coming from his mouth, without more, is insufficient evidence to create a triable issue of whether Mr. Call suffered trauma.

The parties devote considerable argument as to whether a heart attack is excluded under the exclusionary provision of the policy and whether a Non-Occupational Rider added to the policy creates ambiguities with respect to the scope of coverage.  However, the Court need not address those issues because Plaintiff has failed to carry her burden of proof to show at least a triable issue on whether or not Mr. Call suffered an "accident" as that term in ordinarily and plainly intended.  Even if the Court ignored the death certificate and Mr. Call's medical history and disregarded the Affidavit of Ms. Herdman, the cause of Mr. Call's death is simply unknown and none of Plaintiff's evidence reasonably supports a contrary inference.  The fact that the cause of death is unknown does not mean that Mr. Call died of an "accident."  Plaintiff still bears the burden of proof on that issue, and Plaintiff's evidence in that regard is fatally deficient.

## III.
## CONCLUSION

Accordingly, for the foregoing reasons, the Court **DENIES** Plaintiff's Motion to Strike Exhibit F from Defendants' Motion for Partial Summary Judgment [Doc. No. 120]; **DENIES** Plaintiff's Motion to Strike Affidavit of Angela Herdman [Doc. No. 119]; **GRANTS** Defendants' Motion to Strike Plaintiff's Expert. [Doc. No. 122]; **GRANTS** Defendants' Motion for Partial

Summary Judgment [Doc. 110]; and **DENIES** Plaintiff's Motion for Partial Summary Judgment [Doc. 112].  As the Court has ruled in favor of Defendants on the coverage claim, the Court further **DENIES AS MOOT** Defendants' Motion to Bifurcate and Stay the Bad Faith and UTPA Action [Doc. No. 126], but the Court also believes that, in light of today's decision, these claims may no longer be viable.  Therefore, the Court **ORDERS** Plaintiff to show cause on or before **June 16, 2008**, why she should be allowed to proceed on the remainder of her action.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER:          June 6, 2008

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE